IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2008 Session

**STATE OF TENNESSEE v. DARWIN BIBLE**

**Direct Appeal from the Criminal Court for Williamson County**
**No. II-CR081996    Timothy L. Easter, Judge**

_____

**No. M2007-02489-CCA-R3-CD - Filed December 16, 2008**

_____

A Williamson County jury found the Defendant, Darwin L. Bible, guilty of theft of property valued at less than $500; subsequently, the trial court sentenced the Defendant to eleven months, twenty-nine days, with 120 days to be served in jail and the balance to be served on probation. The Defendant appeals, claiming: (1) the State presented insufficient evidence that he committed theft of property valued at less than $500; and (2) the trial court erroneously sentenced him. After a thorough review of the record and the applicable law, we affirm the conviction but modify the jail sentence to sixty days of periodic confinement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Modified, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Gene Honea, Franklin, Tennessee (on appeal); Judson Phillips, Nashville, Tennessee (at trial), for the Appellant, Darwin L. Bible.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Ronald L. Davis, District Attorney General; Mary Katherine White, Assistant District Attorney General, for the Appellee, the State of Tennessee.

**OPINION**

**I. Facts**

**A. Jury Trial**

At the jury trial, the following evidence was presented: Detective Justin Whitwell of the

Spring Hill Police Department testified that on March 15, 2006, he received a call reporting a theft at the Spring Hill Super Cuts. After contacting the Super Cuts manager, Elaine Rising, he took her statement and spoke with various other employees. In addition, Detective Whitwell installed a secret video camera to film the cash register. On cross-examination, Detective Whitwell testified that only Rising knew about the camera.

Elaine Rising testified that she managed the paperwork that "keep[s] track of how many hair cuts . . . colors . . . [and] waxes [they performed], [and] store averages versus employee averages." Rising then described the prescribed procedures for an employee to ring up a customer:

> After we provide the service, we take [the customer] to the front, which is the customer service desk, which is part desk and part register. At that time, we have to fill out a ticket, which requires us to . . . put our name, . . . . the date, . . . our employee number, whether they're new or old customer[s], male or female, what service we did provide, along with the . . . price list of service.

According to the store's protocol, the customer was supposed to pay the employee, who would deposit the money in the cash register. The cash register would then generate two receipts, one for the customer and one for the store. Rising related that the Defendant would receive $15 for cutting a customer's hair, "[a]nd he never went to the computer at that point. He would then proceed, you know, to put it into his pocket." Rising explained that in such instances there were no receipts of the transactions because the Defendant did not enter any information into the computer. Rising testified that she saw the Defendant do this five to ten times a day, with him cutting twenty-five to thirty-five people's hair "on a good day." She also saw him ring up a $12 haircut as a $5 beard trim and keep the difference for himself. Rising first noticed the Defendant take money in November 2005. She told the Defendant to stop stealing money from the store, but he "brushed [her] off." Eventually, Rising told her boss, Nina Richardson, who investigated the matter. After several months and with Richardson threatening to terminate her, Rising contacted the police and helped the police install a hidden camera. After it was installed, the Defendant asked about the orange power cord in the corner, and he later revealed to Rising that he investigated the cord and found it led to a security camera in the ceiling. Rising said she waited to report the Defendant's activities to the police because, "[H]e has a daughter to support, as well as he had just bought a new home in Spring Hill."

On cross-examination, Rising said she was responsible for balancing the books and for hiring and firing employees. She estimated that the register was over or under the prescribed balance for about fifty days. She admitted that there were other employees who used the register and that the drawer was never more than $100 short. On redirect-examination, Rising pointed out that if a transaction was never entered into the computer, there was no way to know whether the drawer was over or under the prescribed balance for that amount.

Latasha Carter testified that she worked at Super Cuts with the Defendant. She saw the Defendant cut someone's hair and fail to enter the transaction in the cash register. Carter said she

2

told Rising what she observed. On cross-examination, Carter said she did not know if the Defendant took money directly from the drawer.

Nina Richardson, the area supervisor for Middle Tennessee's Super Cuts, testified that she "oversees individual state operations, oversees managers, management, training, loss prevention, [and] finding new locations." She said that, when she heard the Defendant might be taking money from Super Cuts, she requested Rising work on the same days as the Defendant in hopes of deterring him. Also, this allowed for more frequent drawer counts to narrow the time period in a workday when money could be stolen. Richardson said the employees are paid bi-monthly with paychecks issued by the payroll department. In addition, she stated that managers are given petty cash credit cards to buy supplies, so there is no reason that an employee would need to take money from the cash register. Richardson said the Defendant was working one hundred percent of the time when the difference between the actual amount and the prescribed balance in the drawer exceeded ten dollars.

On cross-examination, Richardson explained that stealing was a ground for termination, but she needed more than an accusation to fire someone. She admitted that the Defendant sold many hair styling products when he worked. On redirect-examination, Richardson testified that she had Rising fax her the weekly schedules of the employees two weeks in advance. She noted, "The money missing seemed to happen more with certain employees present; like I may be more comfortable to steal in front of you, as opposed to him." In the evenings, Rising called Richardson to report the drawer variance and who worked that day. Richardson then said, "And when the variances got higher and became more frequent, that's when the in-depth auditing started taking place, and the scheduling changes to go along with that."

After hearing the evidence presented, the jury convicted the Defendant of theft of property valued at less than $500.

## B. Sentencing Hearing

At the sentencing hearing, the following evidence was presented: Detective Whitwell testified that he took the Defendant's statement in April 2006. The Defendant initially denied stealing the money, but he eventually admitted that he stole money from Super Cuts for about six months. The Defendant's written statement read, "I Darwin Bible in the past 6 [months] had taken under $500.00." (emphasis in original). The Defendant also admitted to Detective Whitwell that he "had a drug problem."

David Bible, the Defendant's father, testified that the Defendant owns a barbershop in Spring Hill, Tennessee and that he works long hours there. He also said the Defendant is devoted to his wife and young daughter. Bible added that the Defendant "had a drug problem" but had been sober for one year. On cross-examination, Bible acknowledged that the Defendant had used marijuana for at least eleven years.

Angelo Owens, a court advocate for General Sessions Court, testified that he knew the

3

Defendant from a rehabilitation program. He said he often saw the Defendant and knew the Defendant was "involved in the recovery community very heavily."

The Defendant allocuted that he was very serious about his recovery, he worked diligently to support himself and his family, and he regularly attended rehabilitation meetings. He said he owned his own business and worked everyday except Sundays. He declared to the court that he was "secure enough in [his] recovery that [he would] accept" the court's ruling.

After hearing the testimony, the trial court sentenced the Defendant to eleven months, twenty-nine days, with 120 of those days to be served in jail. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant appeals, claiming: (1) the State presented insufficient evidence that he committed theft of property valued at less than $500; and (2) the trial court erroneously sentenced him.

### A. Sufficiency of the Evidence

The Defendant claims the State presented insufficient evidence to support his conviction of theft of property valued at less than $500. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. " 'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.' " *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the

jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Theft of property valued at less than $500 requires that a person "knowingly obtains or exercises control over the property without the owner's effective consent" and that the person has "intent to deprive the owner of property." T.C.A. § 39-14-103 (2006). The property would be valued at less than $500. T.C.A. § 39-14-105(1) (2006). In this case, the manager of the Defendant's place of employment and another employee saw the Defendant steal money using different schemes: sometimes the Defendant failed to deposit money in the register or enter the sale; other times he rang up a more expensive transaction as less expensive and kept the difference. This evidence supports the Defendant's conviction for theft of property valued at less then $500, and he is not entitled to relief on this issue.

### B. Sentencing

The Defendant claims that the trial court erroneously sentenced him when it ordered him to serve 120 days in jail. We review misdemeanor sentencing *de novo* with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d). "[T]he presumption of correctness . . . is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party bears the burden of overcoming this presumption of correctness and showing that the trial court erred. T.C.A. § 40-35-401(d) (2006) Sentencing Comm'n Cmts.

The trial courts have continuing jurisdiction and a great deal of flexibility when sentencing a defendant for a misdemeanor. *See* T.C.A. § 40-35-302(d), Sentencing Comm'n Cmts.; *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995). A trial court is required to conduct a hearing where the parties have "a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." T.C.A. § 40-35-302(a) (2006). When determining the sentence length, the court must "fix a specific number of months, days or hours," and it must also "fix a percentage of the sentence that the defendant shall serve." T.C.A. § 40-35-302(a), (b). While weighing the Defendant's eligibility for an alternative sentence, the trial court should consider whether:

(A)  Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B)  Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C)  Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2006).  After determining the length and manner of the Defendant's sentence, the trial court must also set a percentage defining when the defendant "shall be eligible for consideration for work release, furlough, trusty statue and related rehabilitative programs." T.C.A. § 40-35-302(d); *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998).  When determining the percentage of the sentence to be served before the defendant is eligible for programs, the trial court "shall consider," but does not have to state in the record, the enhancement and mitigating factors applicable to the case when determining the percentage of the sentence to be served before the defendant is eligible for programs.  T.C.A. § 40-35-302(d); *Troutman*, 979 S.W.2d at 274.

When the trial court in this case sentenced the Defendant to eleven months and twenty-nine days, the trial court explained that the Defendant had a history of criminal conduct and had violated a position of trust at his place of employment.  The trial court said:

[B]ased upon the evidence that's been introduced at the sentencing hearing, [the Defendant] does have a history of criminal behavior.  He doesn't have any criminal convictions . . . but there is evidence of criminal behavior – prior criminal behavior.

And most importantly in this case the Defendant, to carry out this crime, abused a position of trust that he had with his employer, and that factor weighs heavily on the Court.

It is an offense . . . that neither caused nor threatened serious bodily injury. . . .  But again, as I've already stated, the appropriate sentence in this case is 11 months and 29 days at 75 percent.

After determining the length of the sentence, the trial court then explained why it ordered the Defendant to serve 120 days of his sentence in jail:

Number one, it's this Court's opinion that the proof in this case was overwhelming that the Defendant was guilty of this offense. . . .

I find that confinement is necessary to avoid depreciating the seriousness of this offense in that, again, the issue of an employee stealing from a person who is giving them the opportunity to make a living in their business is something that this Court and any court, in my opinion, needs to take very serious and do what we can

6

to ensure that that is not depreciated in any way. . . .

And this offense is not something that just happened on one day when he needed some extra money; this was an ongoing incident; not a single, isolated incident. This illegal conduct had been going on for some time over a number of months. . . .

*But I'm going to have to say probably the thing that is most troubling to this case, and the primary reason why the Court feels like a complete suspended sentence and something more than what I probably ordinarily would do in this case is appropriate, is because this Defendant was, as I've already said, overwhelmingly guilty, he knew he was guilty, he confessed to the officer that he was guilty, and then he came into court today and tried to – nothing short of perpetrating fraud on this jury and on the Court in trying to pass this off on a completely innocent lady. The Court finds that just to be repugnant and really untruthful.*

(emphasis added).

The Defendant alleges that the trial court acted with bias towards him at his sentencing hearing. He takes issue with the trial court referring to the Defendant as trying to "pass . . . off" the theft onto someone else. Our review of the record shows no evidence of bias on behalf of the trial court. However, the trial court's comments, on which the Defendant relies to prove bias, do indicate the use by the trial court of an inappropriate reason to impose confinement. The trial court's conclusion that the Defendant was attempting to dishonestly blame someone else for the theft was apparently based on defense counsel's cross-examination and closing argument at trial. While cross-examining Nina Richardson about the reports correlating the daily losses sustained by the company with the names of the employees who worked that day, Counsel made several innuendos that Elaine Rising was the thief:

Q [Defense Counsel]: All right. And Exhibit Number 1, do you recall how many – what percentage of the time [Elaine Rising] was working when there was a shortage?
A [Richardson]: I believe it was 65 to 75 percent. I have a copy of it.
Q: And there's another one done over here where the shortage is in excess of $10. Do you recall what percentage of the time [Rising] was working?
A: Eighty to 90
Q: All right. And, in fact, one of the reports that you generated showed that for a period of time, she worked 100 percent of the time when you – when you sustained certain losses; that not correct?
        . . . .
A: She did.

During his cross-examination, Defense Counsel explicitly named Rising as the person stealing from Super Cuts. He began by pointing out that Rising was the only employee who saw the Defendant

7

stealing, and he then theorized about Rising blaming Bible to cover for her own stealing:

> All these other people listed, the only person who saw anything was Ms. Rising.
>
> Ms. Rising was the manager, Ms. Rising set the schedule, Ms. Rising had access to the employee numbers; the number that you kick in, or put into the computer, to say that you're there. She set the schedule.
>
> The information that is shown in Exhibit 1 and Exhibit 2 doesn't really show you when somebody came in; it just shows you that they were there on that day.
>
> So who puts the blame. Ms. Rising.
>
> And what does Ms. Rising say. She says she would see Mr. Bible steal 5 to 10 times a day.
>
> . . . .
>
> You want to blame somebody, who had opportunity. Elaine Rising. Who was the person who was in the know. Elaine Rising.
>
> Is it more plausible that Mr. Bible was doing all this stealing and the manager of this store was just sitting there going, okay, he can steal. Is it more plausible he was stealing, or is it more plausible that she was stealing and blaming him. . . .
>
> I have my suspicions, but my suspicions do not point in the direction of Mr. Bible; they point in the direction of Ms. Rising.
>
> Did she steal, or is their accounting so sloppy that nobody can tell. Who knows. At this point I don't know and I don't have to.
>
> There is no proof that Mr. Bible took money. The only proof is offered by somebody who has a motive to come in here and say it was him. She's the manager who, if you believe her testimony, was allowing this man to steal Super Cuts blind 5 or 10 times a day for a period of six months. . . .
>
> If there's employee theft going on at Super Cuts, I think the proof today shows it's Elaine Rising and not Darwin Bible.

We are mindful that "a trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion" and that "[s]ince the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). "Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors." *Id.* The *Carter* opinion continues to say that "if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *Id.* As a result, "[t]he appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Id.* at 345-46. However, the narrowing of circumstances in which this court may find and correct error in sentencing under *Carter* does not preclude a determination, as in this case, that an inappropriate enhancement factor or an inappropriate reason to impose confinement has been applied. The application of an inappropriate enhancement factor or reason to impose confinement

8

differs from the weighing by the trial court of appropriate enhancing factors, and should be corrected by this court. Neither cross-examination questions nor statements of counsel during closing argument are evidence. Tenn. Pattern Jury Instructions -- Criminal 1.07. Given that the trial court expressly gave great weight to the Defendant's counsel's cross-examination of witnesses and closing argument statements when it ordered the Defendant to serve 120 days in jail, we conclude that the jail sentence should be reduced. We therefore reduce the jail sentence from 120 days to sixty days, to be served in forty consecutive periods of thirty-six hours each, with each period beginning on Saturday at 6 P.M. and ending on Monday at 6 A.M.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude: (1) the State presented sufficient evidence that the Defendant stole property valued at less than $500; and (2) the trial court improperly sentenced the Defendant. As such, we modify the trial court's judgment, and we order the Defendant to serve sixty days in jail, to be served in forty consecutive periods of thirty-six hours each, with each period beginning on Saturday at 6 P.M. and ending on Monday at 6 A.M. We affirm the conviction, but we modify the sentence as set forth herein and remand the case to the trial court for the entry of a corrected judgment consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE

9